1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10

11    DANIEL L. SNOWDEN,                    Case No. 1:19-cv-00843-AWI-CDB (PC)

12                    Plaintiff,            **FINDINGS AND RECOMMENDATIONS TO**
                                           **GRANT DEFENDANTS' MOTION FOR**
13        v.                               **SUMMARY JUDGMENT**

14    H. TATE; M. TOSCANO,                  (Doc. 34)

15                    Defendants.           **14-DAY OBJECTION PERIOD**

16

17        Plaintiff Daniel L. Snowden is proceeding *pro se* and *in forma pauperis* in this civil rights

18   action brought pursuant to 42 U.S.C. § 1983.

19        **I.      RELEVANT PROCEDURAL BACKGROUND**

20        Plaintiff initiated this action with the filing of his complaint on June 17, 2019. (Doc. 1.)

21        Following screening (Doc. 10), Plaintiff elected to proceed on the claims found

22   cognizable by the Court (Doc. 11). Therefore, on January 30, 2020, findings and

23   recommendations issued recommending Plaintiff's claims be dismissed except for his claims of

24   retaliation against Defendants Tate and Toscano and a deliberate indifference to serious medical

25   needs claim against Defendant Tate. (See Docs. 10 & 13.) District Judge Anthony W. Ishii

26   adopted the findings and recommendation in full on March 4, 2020. (Doc. 17.)

27        On April 13, 2020, Defendants Tate and Toscano filed an answer to Plaintiff's complaint.

28   (Doc. 19.)

On May 28, 2020, the Court issued its Discovery and Scheduling Order. (Doc. 27.) In an Order Granting Defendants' Motion to Modify Discovery and Scheduling Order, issued October 15, 2020, the Court extended the deadline to complete all discovery and the deadline for filing pretrial dispositive motions. (Doc. 33.)

On February 26, 2021, Defendants filed a motion for summary judgment and supporting documentation. (Doc. 34.)  Plaintiff responded on April 26, 2021 (Doc. 37) and Defendants replied on May 4, 2021 (Doc. 38).

## II.     PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that on December 20, 2018 he visited Dr. Tate to address his chronic pain. (Doc. 1 at 13.) Plaintiff was diagnosed with chronic pain syndrome in 2017. Plaintiff alleges that, after informing Dr. Tate of his pain, Tate began to laugh and said, "'f… you and your pain … you['re] a dumb … inmate who [doesn't] know what real pain is.'" (*Id.*) Plaintiff told Tate that he was acting unprofessionally, and Plaintiff would file a health care grievance to address his "poor conduct." (*Id.* at 13-14.) Tate replied that, if Plaintiff filed a grievance, he would "f… [Plaintiff's] whole world up." (*Id.* at 14.)

Plaintiff filed a grievance against Dr. Tate. (Doc. 1 at 14.) On January 15, 2019, Tate "completely stopped" Plaintiff's pain medication. (*Id.*) Plaintiff filed several health care requests to restart his medication due to "severe neck pain," but Tate denied these requests and any type of "pain management." (*Id.* at 14-15.)

On December 24, 2018, Plaintiff appeared before a classification committee to "receive a chrono for the plaintiff's high risk medical." (Doc. 1 at 15.) On January 16, 2019, Correctional Counselor Toscano informed Plaintiff that he had spoken with Dr. Tate, and "they both agreed 'that they would make sure that [his] high risk medical chrono would be taken away.'" (*Id.* at 15-16.) Toscano then "had the plaintiff appear before classification and had [his] high risk medical taken away and made [him] medium risk medical…. Plaintiff's transfer to a medical facility was also [cancelled]." (*Id.* at 16.)

Plaintiff states that he has been in severe pain, including migraines and muscle spasms, and he cannot eat solid foods due to the pain. (Doc. 1 at 17.) He states that every time he visits

1  Dr. Tate, he is met with "anger, frustration and total disrespect." (*Id.*)

2  Plaintiff's action proceeds on his claim of deliberate indifference to serious medical needs

3  against Defendant Tate and his retaliation claims against Defendants Tate and Toscano. (Docs. 13

4  & 17.)

5  **III.   LEGAL STANDARDS**

6  **A.  Summary Judgment**

7  Summary judgment is appropriate when the moving party "shows that there is no genuine

8  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

9  Civ. P. 56(a). The moving party "initially bears the burden of proving the absence of a genuine

10  issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing

11  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by

12  "citing to particular parts of materials in the record, including depositions, documents,

13  electronically stored information, affidavits or declarations, stipulations …, admissions,

14  interrogatory answers, or other materials," or by showing that such materials "do not establish the

15  absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

16  evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears

17  the burden of proof at trial, "the moving party need only prove that there is an absence of

18  evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*,

19  477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).

20  Summary judgment should be entered against a party who fails to make a showing

21  sufficient to establish the existence of an element essential to that party's case, and on which that

22  party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of

23  proof concerning an essential element of the nonmoving party's case necessarily renders all other

24  facts immaterial." *Id.* at 322–23. In such a circumstance, summary judgment should be granted,

25  "so long as whatever is before the district court demonstrates that the standard for the entry of

26  summary judgment … is satisfied." *Id.* at 323.

27  In judging the evidence at the summary judgment stage, the court may not make

28  credibility determinations or weigh conflicting evidence. *Soremekun v. Thrifty Payless, Inc.*, 509

3

1   F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted). It must draw all inferences

2   in the light most favorable to the nonmoving party and determine whether a genuine issue of

3   material fact precludes entry of judgment. *Comite de Jornaleros de Redondo Beach v. City of*

4   *Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted). The

5   court determines only whether there is a genuine issue for trial. *Thomas v. Ponder*, 611 F.3d

6   1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

### B. Retaliation

Prisoners have a First Amendment right to file prison grievances and retaliation against

prisoners for exercising this right is a constitutional violation. *Rhodes v. Robinson*, 408 F.3d 559,

566 (9th Cir. 2005); *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003). A claim for First

Amendment retaliation in the prison context requires: (1) that a state actor took some adverse

action against the plaintiff (2) because of (3) the plaintiff's protected conduct, and that such

action (4) chilled the plaintiff's exercise of his First Amendment rights, and (5) "the action did

not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567-68; *Brodheim v.*

*Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009). To prove the second element, retaliatory motive,

plaintiff must show that his protected activities were a "substantial" or "motivating" factor behind

the defendant's challenged conduct. *Brodheim*, 584 F.3d at 1269, 1271. Plaintiff must provide

direct or circumstantial evidence of defendant's alleged retaliatory motive; mere speculation is

not sufficient. *See McCollum v. CDCR*, 647 F.3d 870, 882-83 (9th Cir. 2011); accord *Wood v.*

*Yordy*, 753 F.3d 899, 905 (9th Cir. 2014). In addition to demonstrating defendant's knowledge of

plaintiff's protected conduct, circumstantial evidence of motive may include: (1) proximity in

time between the protected conduct and the alleged retaliation; (2) defendant's expressed

opposition to the protected conduct; and (3) other evidence showing that defendant's reasons for

the challenged action were false or pretextual. *McCollum*, 647 F.3d at 882.

### C. Deliberate Indifference to Serious Medical Needs

Prison officials violate the Eighth Amendment if they are "deliberate[ly] indifferen[t] to [a

prisoner's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A medical need

is serious if failure to treat it will result in "'significant injury or the unnecessary and wanton

infliction of pain.'"'" *Peralta v. Dillard*, 744 F.3d 1076, 1081-82 (9th Cir. 2014) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006), quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)). "A prison official is deliberately indifferent to that need if he 'knows of and disregards an excessive risk to inmate health.'" *Peralta*, at 1082 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

To maintain an Eighth Amendment claim based on medical care in prison, a plaintiff must first "show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendants' response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett*, 439 F.3d at 1096 (quotation marks omitted)).

As to the first prong, indications of a serious medical need "include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation and internal quotation marks omitted); accord *Wilhelm*, 680 F.3d at 1122; *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000).

As to the second prong, deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer*, 511 U.S. at 835 (quoting *Whitley*, 475 U.S. at 319). Deliberate indifference is shown where a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. In medical cases, this requires showing: (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Wilhelm*, 680 F.3d at 1122 (quoting *Jett*, 439 F.3d at 1096). "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." *Jett*, 439 F.3d at 1096, citing *McGuckin*, 974 F.2d at 1060. Deliberate

indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" *Id.* (quoting *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002)). To prevail on a deliberate-indifference claim, a plaintiff must also show that harm resulted from a defendant's wrongful conduct. *Wilhelm*, 680 F.3d at 1122; *see also Jett*, 439 F.3d at 1096; *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (prisoner alleging deliberate indifference based on delay in treatment must show delay led to further injury).

## IV.   DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

Defendants submit the following undisputed facts:

1.  At all times relevant to this action, Plaintiff Daniel L. Snowden (CDCR No. G15039) was in the custody of the California Department of Corrections and Rehabilitation ("CDCR") as a prisoner at California Correctional Institution ("CCI"). (Pl.'s Dep. 13:13-16, attached as Attachment 1.)

2.  Plaintiff was first housed at CCI on November 17, 2018, and he remained housed there through the date on which he commenced the instant litigation. (Plaintiff's External Movements History, attached as Attachment 2.)

3.  During all times alleged in the complaint, Dr. Tate was employed by CDCR as a physician at CCI. (Declaration of Dr. Tate ("Tate Decl.") ¶ 1, attached as Attachment 3.)

4.  During all times alleged in the complaint, Toscano was employed by CDCR as a correctional counselor at CCI. (Declaration of M. Toscano ("Toscano Decl.") ¶ 1, attached as Attachment 4.)

5.  After Plaintiff transferred to CCI on November 17, 2018, Dr. Tate was assigned Plaintiff's primary care physician ("PCP"). (Tate Decl. ¶ 6.)

6. As PCP, Dr. Tate's duties included reviewing inmate-patients' medical records for assessment of their medical condition or diagnosis, meeting with and providing medical care to patients, developing treatment plans, and referring patients for follow-up appointments or visits as necessary. (Tate Decl. ¶ 1.)

7. Dr. Tate's initial visit with Plaintiff was on November 28, 2018. (Tate Decl. ¶ 7.)

8. At the time of the November 28, 2018 visit, Plaintiff had been diagnosed with Graves' disease, an autoimmune disorder that causes hyperthyroidism (i.e., an overproduction of thyroid hormones), which manifests symptoms such as swelling in the neck area. (Tate Decl. ¶ 7.)

9. At the time of the November 28, 2018 visit, Plaintiff had been prescribed with gabapentin, to treat reported pain. (Tate Decl. ¶ 7.)

10. As of the November 28, 2018 visit, Plaintiff had been prescribed with at least eighteen medications and had a history of drug dependency. (Tate Decl. ¶ 8.)

11. Based on a physical exam conducted on November 28, 2018, Dr. Tate determined that Plaintiff was not in any acute distress. (Tate Decl. ¶ 8.)

12. At the time of the November 28, 2018 visit, it was Dr. Tate's medical opinion that gabapentin may be abused and diverted in the correctional setting. (Tate Decl. ¶ 8.)

13. Based on his clinical assessment that Plaintiff did not suffer from any acute distress, as well as Plaintiff's history of drug dependency, Dr. Tate determined during the November 28 visit that Plaintiff's gabapentin prescription was not medically indicated. (Tate Decl. ¶ 8.)

14. In particular, it was Dr. Tate's medical opinion that gabapentin was not an appropriate course of treatment for Plaintiff's chronic pain condition, which required long-term management. (Tate Decl. ¶ 8.)

15. As potential alternatives to gabapentin, during the November 28 visit, Dr. Tate offered more appropriate anti-inflammatory and antiepileptic medications to Plaintiff, but he refused them. (Tate Decl. ¶ 8.)

16. Based on the November 28, 2018 visit, Dr. Tate determined it was medically

appropriate to continue prescriptions aimed at treating Plaintiff's hyperthyroidism condition. (Tate Decl. ¶ 9.)

17. As such, Dr. Tate issued an order that Plaintiff continue his methimazole prescription, which is typically used to treat hyperthyroidism. (Tate Decl. ¶ 9.)

18. Dr. Tate also referred Plaintiff for a thyroid stimulating hormone (TSH) test within thirty days, which is generally used to measure how well the thyroid is functioning. (Tate Decl. ¶ 9.)

19. Additionally, Dr. Tate referred Plaintiff to an endocrinology specialist for further evaluation of his Graves' disease. (Tate Decl. ¶ 9.)

20. At the time of the November 28 visit, Plaintiff had been prescribed naproxen, which is typically used for pain management, and Dr. Tate did not disturb this prescription. (Tate Decl. ¶ 8.)

21. At the time that Plaintiff's gabapentin was discontinued on November 28, 2018, Dr. Tate was unaware that Plaintiff had filed any 602 appeal related to his care. (Tate Decl. ¶ 15.)

22. On January 24, 2019, Dr. Tate saw Plaintiff for another scheduled medical visit, in part to assess his Graves' disease and reported throat pain. (Tate Decl. ¶ 10.)

23. Plaintiff had been seen by an endocrinologist specialist, Dr. Pawan Kumar, during a telemedicine visit on January 10, 2019. (Tate Decl. ¶ 10.)

24. During the January 24, 2019 visit, Dr. Tate noted Dr. Kumar's visit with Plaintiff, reflecting that Dr. Kumar noted no acute conditions. (Tate Decl. ¶ 10.)

25. Dr. Tate noted that Dr. Kumar recommended that the methimazole medication be continued, a new thyroid sonogram be conducted, and the propranolol prescription be changed to atenolol. (Tate Decl. ¶ 10.)

26. During the January 24 visit with Dr. Tate, Plaintiff complained about throat pain and requested that his gabapentin prescription be reinstated. (Tate Decl. ¶ 10.)

27. Based on Dr. Tate's assessment of Plaintiff's condition during the January 24, 2019 visit, he concluded that gabapentin was not medically indicated and denied his request,

though Dr. Tate determined that methimazole should be continued. (Tate Decl. ¶ 11.)

28. While Plaintiff complained about throat pain, no clinical findings warranted reinstatement of gabapentin. (Tate Decl. ¶ 11.)

29. After Dr. Tate informed Plaintiff during the January 24, 2019 visit that his gabapentin prescription would not be reinstated, he said he was unhappy with his decision and threatened to file a 602 medical grievance. (Tate Decl. ¶ 12.)

30. On March 8, 2019, Dr. Tate saw Plaintiff for a routine re-evaluation of hypertension and his Graves' disease, where Plaintiff complained of throat pain and requested that his gabapentin prescription be reinstated. (Tate Decl. ¶ 13.)

31. Based on his professional opinion that gabapentin was not medically indicated, Dr. Tate denied Plaintiff's request. (Tate Decl. ¶ 13.)

32. Dr. Tate noted that, in response to his denial of Plaintiff's request for gabapentin, Plaintiff said "I will just have to file paperwork on that," which Dr. Tate understood to be a threat to commence legal action. (Tate Decl. ¶ 13.)

33. On May 7, 2019, Dr. Tate saw Plaintiff for a medical visit, but gabapentin was neither raised nor discussed during this visit. (Tate Decl. ¶ 14.)

34. At no point during any of the scheduled visits with Plaintiff did Dr. Tate ridicule Plaintiff or demean his reported pain. (Tate Decl. ¶ 15.)

35. At no point during any of the scheduled visits with Plaintiff did Dr. Tate threaten to retaliate against him for any reason. (Tate Decl. ¶ 15.)

36. As potential alternatives to gabapentin, Dr. Tate offered more appropriate antiinflammatory and antiepileptic medications to Plaintiff, but he refused them, and Dr. Tate elected to continue naproxen—medication typically used for pain management. (Tate Decl. ¶¶ 8, 11, 14.)

37. Generally, inmates who are patients through the California Correctional Health Care Services (CCHCS) are classified by a medical risk level—low, medium, or high—and such designations are reflected in medical classification chronos that custody staff rely on to ensure the inmate is properly housed in the institutional setting in light of the

9

inmate's medical needs and/or conditions. (Tate Decl. ¶ 15; Toscano Decl. ¶ 4.)

38. The medical classification chrono provides guidance to clinical and custody staff when making inmate placement decisions. (Tate Decl. ¶ 15; Toscano Decl. ¶ 4.)

39. Only a primary care provider (physician, nurse practitioner, or physician assistant) may personally issue or update a medical classification chrono, albeit in certain instances, the electronic system that maintains medical chrono records may prompt automated changes to an inmate's medical risk level, based on changes to the most current clinical or medical information pertaining to the inmate, or based on data entered by medical staff. (Tate Decl. ¶ 15; Toscano Decl. ¶¶ 4, 14.)

40. At the time of Plaintiff's November 28, 2018 visit with Dr. Tate, Plaintiff's medical risk level was "high risk," and he remained designated as high risk until January 16, 2019. (Tate Decl. ¶ 20; Toscano Decl. ¶¶ 13-14; Plaintiff's Medical Classification Chronos List, attached as Attachment 5.)

41. On January 16, 2019, Plaintiff's medical risk level changed from "high risk" to "medium risk." (Tate Decl. ¶ 20; Toscano Decl. ¶ 14.)

42. Dr. Tate did not issue any chronos designating Plaintiff as "medium risk." (Tate Decl. ¶ 20.)

43. The sole chrono that Dr. Tate issued after Plaintiff was transferred to CCI was on January 15, 2019, which designed Plaintiff as "high risk." (Tate Decl. ¶ 20.)

44. Counselor Toscano did not issue any medical classification chronos concerning Plaintiff, and he lacked authority to do so. (Tate Decl. ¶ 16; Toscano Decl. ¶ 5.)

45. Toscano did not communicate with Dr. Tate concerning Plaintiff's medical risk classification. (Tate Decl. ¶ 18; Toscano Decl. ¶ 9.)

46. To the extent Toscano had contact with any staff regarding Plaintiff's medical chrono, it was to confirm the accuracy of, and correctly document, Plaintiff's medical risk assessment. (Toscano Decl. ¶¶ 2, 5, 13.)

47. Plaintiff lacks awareness of the circumstances surrounding issuance of any of the medical chronos alleged in the complaint. (Pl.'s Dep. 21:14-19.)

10

48. Classification committee members neither issue nor decide an inmate's medical classification chrono. (Toscano Decl. ¶ 7.)

49. At most, committee members may review and take into account medical classification chronos during committee hearings as part of an overall assessment of the inmate's placement and/or programming needs. (Toscano Decl. ¶ 7.)

50. Plaintiff had classification committee hearings on the following days: November 27, 2018; January 15, 2019; January 29, 2019; and June 4, 2019. (Toscano Decl. ¶ 10.)

51. Plaintiff did not appear for any classification committee hearings on December 24, 2018, or January 16, 2019. (Toscano Decl. ¶ 10.)

52. Toscano was not involved in Plaintiff's classification committee hearing on November 27, 2018. (Toscano Decl. ¶ 12.)

53. Toscano was present for Plaintiff's classification committee hearings on January 15, 2019, January 29, 2019, and June 4, 2019, where Toscano's role was to take notes of and document the hearing's proceedings. (Toscano Decl. ¶ 11.)

54. While Toscano was present during the January 15, 2019, January 29, 2019, and June 4, 2019 hearings, he did not unilaterally decide Plaintiff's programming and/or housing placement, for the committee as a whole rendered decisions based on Plaintiff's case factors. (Toscano Decl. ¶ 11.)

55. Toscano did not influence committee members to take any action inconsistent with Plaintiff's case factors. (Toscano Decl. ¶ 11.)

(Doc. 34-3.)

**A. Evidentiary Matters**

In their reply to Plaintiff's opposition, Defendants argue Plaintiff's response, filed April 26, 2021,[1] is untimely and thus should be disregarded. (Doc. 38 at 3.) Plaintiff's opposition should have been filed on or before March 19, 2021 (*see* Local Rule 230(l)) plus time for mailing. Nevertheless, in the interests of justice, the Court elects to consider Plaintiff's arguments in opposition to Defendants' motion for summary judgment.

---

[1] Plaintiff dated his opposition in three places. At page 12 of the filing, Plaintiff signed and dated the document "March 15, 2021." At pages 13 and 14 of the filing, Plaintiff signed and dated the document April 20, 2021.

1    Next, Defendants contends Plaintiff failed to comply with Local Rule 260(b) by failing to

2  reproduce the Statement of Undisputed Facts and to admit or deny those facts. (Doc. 38 at 3.)

3  Defendants further contend Plaintiff's use of the phrase "disputed facts" in his opposition are

4  largely legal arguments that should be afforded no weight, and that those statements of

5  undisputed fact not addressed in Plaintiff's opposition should be deemed undisputed for these

6  purposes. (*Id*. at 3-4.)  Defendants state they "could only identify one plausible disputed fact,"

7  identified by Plaintiff as "bullet point number nine." (*Id*. at 4.) As to that disputed fact,

8  Defendants contend Plaintiff did not proffer any evidence in support of his dispute of the fact

9  Defendant Toscano did not communicate with Dr. Tate regarding Plaintiff's medical

10  classification. (*Id.* at 4-5.) Moreover, Defendants contend the statement is immaterial because a

11  "mere conversation between Toscano and Dr. Tate, without more, would not establish any

12  element of a retaliation claim." (*Id*. at 5.)

13    This Court's Local Rule 260(b) provides, in pertinent part:

14    **Opposition**. Any party opposing a motion for summary judgment or
15    summary adjudication shall reproduce the itemized facts in the
      Statement of Undisputed Facts and admit those facts that are
16    undisputed and deny those that are disputed, including with each
      denial a citation to the particular portions of any pleading, affidavit,
17    deposition, interrogatory answer, admission, or other document
      relied upon in support of that denial. The opposing party may also
18    file a concise "Statement of Disputed Facts," and the source thereof
      in the record, of all additional material facts as to which there is a
19    genuine issue precluding summary judgment or adjudication. The
      opposing party shall be responsible for the filing of all evidentiary
20    documents cited in the opposing papers. See L.R. 133(j).

21  (*See also* Doc. 34-1 [Defendants' Rand Warning to Plaintiff Regarding Opposing Summary

22  Judgment].) Here, because Plaintiff has not complied with Rule 260(b),[2] the Court deems Plaintiff

23  to have admitted those facts not disputed by his complaint or other submissions. *See, e.g.*, *Beard*

24

25  [2] Plaintiff's opposition generally alleges Defendants' facts are "not true," but he failed to reproduce Defendants'
    statement of undisputed facts, nor did he admit or deny them. Simply referring to "disputes" with "Paragraph A" or
26  "Paragraph B" or "1st Disputed Facts" and "2nd Disputed Facts," does not suffice. Defendants identified 55 separate
    facts. Following a comparison of Plaintiff's opposition and Defendants' statement, the undersigned finds Plaintiff's
27  opposition references only one specific fact identified by Defendants as undisputed: Number 45. It reads: "Toscano
    did not communicate with Dr. Tate concerning Plaintiff's medical risk classification. (Tate Decl. ¶ 18; Toscano Decl.
28  ¶ 9.)" Plaintiff quotes this proffered fact at page 9 of his opposition and states it is "not true." (Doc. 37 at 9.) But
    otherwise Plaintiff's opposition references only Defendants' argument; Plaintiff failed to reproduce Defendants'
    statement or to admit or deny the facts offered therein.

*v. Banks*, 548 U.S. 521, 527 (2006) ("by failing specifically to challenge the facts identified in the defendant's statement of undisputed facts, [plaintiff] is deemed to have admitted the validity of the facts contained in the [defendant's] statement."); *Brito v. Barr*, No. 2:18-cv-00097-KJM-DB, 2020 WL 4003824, at *6 (E.D. Cal. July 15, 2020) (deeming defendant's undisputed facts as admitted after plaintiff failed to comply with Local Rule 260(b)); *see also Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

## V.   DISCUSSION

### A.  Deliberate Indifference to Serious Medical Needs: Tate

Plaintiff asserts a claim that Defendant Tate was deliberately indifferent to his serious medical needs when Tate discontinued Plaintiff's prescription of gabapentin, a medication Plaintiff alleges is the sole medication that effectively treats his chronic pain.

Defendants contend Tate did not ignore Plaintiff's reported pain, that gabapentin was discontinued because Plaintiff was in no acute distress when examined by Tate and the medication can be abused in correctional setting, Plaintiff is known to be drug dependent, that naproxen is used to treat long term pain complaints, and that Tate treated Plaintiff's hyperthyroidism on that same date.

Plaintiff's opposition argues Defendant Tate violated Plaintiff's rights "by taking away the Plaintiff's gabapentin and leaving Plaintiff to suffer 'extreme pain' for several years." (Doc. 37 at 2.) Plaintiff alleges the doctor should have weaned him from the medication rather than discontinuing it. (*Id*.) Plaintiff argues Defendant Tate "acted reckless" and ignored his serious medical needs. (*Id*. at 4-6.)

#### 1.  Defendants' Undisputed Facts Relevant to the Claim

Defendants undisputed fact numbers 7 through 36 specifically relate to Defendant Tate's care of Plaintiff. Each statement is supported by Tate's declaration and any relevant exhibits. Because Plaintiff has failed to specifically admit or deny the proffered facts, the undersigned deems them admitted.

//

//

13

## 2. Summary of Defendant Tate's Declaration

Defendant Tate treated Plaintiff for the first time on November 28, 2018. On that occasion, following a review of Plaintiff's medical records maintained by CDCR, and following a physical examination that revealed Plaintiff was not in acute distress, Defendant Tate concluded gabapentin was not medically necessary to treat Plaintiff's chronic pain syndrome. The doctor concluded alternative medications were more appropriate, particularly given Plaintiff's history of multi-drug dependency and medical guidance cautioning that gabapentin may be abused and diverted in a correctional setting. Defendant Tate declared gabapentin was not appropriate for long term pain management and offered alternative medications; Plaintiff refused the alternate medications. The use of naproxyn was continued to address pain management. (Doc. 34-4 at ¶¶ 7-8 & Ex. A.) During that same appointment, the doctor found it medically appropriate to continue treatment of Plaintiff's hyperthyroid condition and referred Plaintiff for further lab testing and to an endocrinology specialist. (*Id*. at ¶ 9.)

On January 24, 2019, Defendant Tate saw Plaintiff after Plaintiff was seen by the endocrinologist on January 10, 2019. Although Plaintiff complained of throat pain during the visit with Defendant Tate, the doctor denied Plaintiff's request for gabapentin. The doctor noted the endocrinologist did not identify any acute conditions, and Tate's physical examination revealed no clinical findings warranting gabapentin. Certain changes were made to Plaintiff's other medications treating hyperthyroidism or other conditions not associated with pain. (Doc. 34-4 at ¶¶ 10-11 & Ex. B & C.) Defendant Tate declared Plaintiff was unhappy at the conclusion of this visit and indicated an intent to file a grievance. (*Id*. at ¶ 12.)

Defendant Tate saw Plaintiff again on March 8, 2019, to reevaluate Plaintiff's hypertension and thyroid condition. Plaintiff again requested gabapentin and the doctor again denied the request as not medically appropriate. Defendant Tate terminated the appointment "due to threat of legal action" by Plaintiff. (Doc. 34-4 at ¶ 13 & Ex. D.)

On May 7, 2019, Defendant Tate saw plaintiff for a thyroiditis check. Plaintiff complained of dizziness, fatigue, neck pain and eczema. Medications used to treat Plaintiff's thyroid condition were modified and naproxyn was continued. No request for or discussion of gabapentin

14

occurred on this occasion. (Doc. 34-4 at ¶ 14 & Ex. E.)

Defendant Tate denied ridiculing or demeaning Plaintiff's reported pain at any time during his treatment of Plaintiff. (Doc. 34-4 at ¶ 15.)

### 3.   Analysis

Deliberate indifference has both an objective and a subjective component. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The objective component considers whether the deprivation was sufficiently serious, and the subjective component considers if the officials acted with a sufficiently culpable state of mind. *Id*. at 298.

Defendants do not allege Plaintiff lacked a serious medical need. The Court therefore presumes such a need exists.[3] The issue here concerns whether there is a genuine issue of material fact concerning the subjective component of the test: whether Defendant Tate acted with a sufficiently capable state of mind.

Defendants' undisputed material facts and evidence indicate that Defendant Tate concluded, following a review of Plaintiff's medical records and following various physical examinations, that gabapentin was not medically appropriate to treat Plaintiff's pain complaints. That determination was also made in light of Plaintiff's history of multi-drug dependency and written guidance cautioning that gabapentin could be abused and diverted in a correctional setting. While gabapentin was discontinued, naproxyn use was continued to address pain management and additional alternative medications were offered to Plaintiff. (Doc. 34-3, ¶¶ 7-36.)

Defendant Tate has met his initial responsibility of identifying those portions of the record that show there is no genuine issue of material fact that he was deliberately indifferent to Plaintiff's serious medical needs. *Celotex Corp.*, 477 U.S. at 322. The burden shifts to Plaintiff to establish that a genuine issue as to any material fact actually exists. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

//

---

[3] Plaintiff's complaint alleges he was diagnosed with chronic pain syndrome in 2017. (Doc. 1.) The medical records supporting Defendants' summary judgment motion, dated November 28, 2018 and later, refer to an existing diagnosis of chronic pain syndrome. At his deposition, Plaintiff testified "Dr. Kumar" diagnosed him with chronic pain syndrome "for his thyroid." (Snowden Depo., at 31-34.)

Plaintiff has not met his burden to establish a genuine issue of material fact actually exists. Defendant Tate's discontinuation of gabapentin to treat Plaintiff's pain amounts to a difference of opinion regarding the proper course of treatment. Yet, a "difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012), overruled in part on other grounds by *Peralta v. Dillard*, 744 F.3d at 1082-83. A mere "difference of medical opinion … [is] insufficient … to establish deliberate indifference. *Toguchi*, 391 F.3d at 1058; *see also Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (a prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference). Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." *Snow*, 681 F.3d at 988 (citing *Jackson*, 90 F.3d at 332) (internal quotation marks omitted). Plaintiff fails to make this showing. Plaintiff is not medically trained. *See* Fed. R. Evid. 701, 702. He offers no evidence to show Defendant Tate's course of treatment—discontinuing gabapentin in favor of the continued use of naproxyn in the absence of a finding of acute distress—was medically unacceptable. Plaintiff's opposition offers nothing more than his own conclusory allegations and is insufficient to defeat a properly supported motion for summary judgment. *See* S*oremekun*, 509 F.3d at 984 (neither speculation nor conclusory statements will create a genuine dispute on summary judgment); *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact").

To the extent Plaintiff's allegations create a disputed issue of fact regarding the degree of pain he suffered when gabapentin was discontinued (*see* Doc. 37 at 2), the dispute is ultimately immaterial because there is no evidence to support a finding that Dr. Tate acted with deliberate indifference to Plaintiff's medical needs by recommending the discontinuation of gabapentin. To the contrary, the evidence is undisputed that Dr. Tate continued to prescribe naproxyn, a medication that he believed was more appropriate and by offering Plaintiff alternative

1    medications, but Plaintiff refused these alternative medications. As a prisoner, Plaintiff is not

2    entitled to every medical treatment he desires. *See Hudson v. McMillan*, 503 U.S. 1, 9 (1992);

3    *Toguchi*, 391 F.3d at 1058. Thus, because Plaintiff is not entitled to the pain medication of his

4    choice (gabapentin) and because he could have taken alternative medication but refused,

5    Plaintiff's deliberate indifference claim against Dr. Tate falls short.

6            To the extent Plaintiff contends Defendant Tate's deliberate indifference to his serious

7    medical needs is evidenced by Defendant Tate's vulgar language and disrespectful behavior as

8    alleged by Plaintiff (*see, e.g.,* Doc. 1 at 7, 10, 13-14, 17-18; Snowden Depo., at 21-22, 28, 39-41,

9    45, 48, 66-67), even accepting those allegations as true, that evidence does not create a genuine

10    issue of material dispute concerning Plaintiff's claim. That is so because "'[v]erbal harassment or

11    abuse … is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983.'"

12    *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (quoting *Collins v. Cundy*, 603 F.2d

13    825, 827 (10th Cir. 1979); *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996) (stating that

14    "verbal harassment generally does not violate the Eighth Amendment"); *Gaut v. Sunn*, 810 F.2s

15    923, 925 (9th Cir. 1987); *Garbarini v. Ulit*, No. 1:14-cv-01058-AWI-SAB (PC), 2017 WL

16    4224947, at *20 (E.D. Cal. Sept. 11, 2017) ("even if Defendant Moon was rude and hostile this

17    would not rise to the level of deliberate indifference"); *Acuna v. Ikegbu*, No. 14–CV–03651–JCS

18    (PR), 2014 WL 7183702, at *3 (N.D. Cal. Dec. 15, 2014) (yelling at a patient may be rude but

19    does not show deliberate indifference).

20            This record is devoid of evidence that Plaintiff's pain medication treatment was medically

21    unacceptable or that it was chosen "in conscious disregard of an excessive risk to [his] health."

22    *Snow*, 681 F.3d at 688 (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1986). In sum, the

23    undersigned finds no evidence raising a triable issue of fact as to whether Dr. Tate was

24    deliberately indifferent to Plaintiff's medical needs and recommends that Defendant Tate be

25    granted summary judgment on this claim.

26    //

27    //

28    //

**B. Retaliation: Tate and Toscano**

Plaintiff has alleged retaliation claims against Defendants Tate and Toscano. Plaintiff alleges Tate and Toscano changed his medical classification from high risk to medium risk in retaliation for Plaintiff having filed a grievance against Defendant Tate.

Defendants assert the undisputed evidence establishes that the alleged retaliation claims fail as a matter of law. More specifically as to Tate, Defendants contend Plaintiff cannot establish retaliation was the but for cause of the adverse action—the change to Plaintiff's medical classification. They further argue the adverse action would have happened anyway. Defendants also contend Defendant Toscano lacked the authority to change Plaintiff's medical classification from high risk to medium risk and that Plaintiff's claim is pure speculation.

**1. Defendants' Undisputed Facts Relevant to the Claims**

Defendants undisputed fact numbers 37 through 55 specifically relate to Plaintiff's claims of retaliation against Defendants Tate and Toscano. Each statement is supported by Tate or Toscano's declaration and any relevant exhibits. But for a single example—Defendants' UDF 45—Plaintiff has failed to specifically admit or deny the proffered facts. Therefore, as to facts 37 through 44, and 46 through 55, the Court deems them admitted.

**2. Summary of Defendant Tate's Declaration**

Defendant Tate's declaration[4] explains the medical risk classification levels, that only a primary care provider—a physician, nurse practitioner, or physician assistant—may issue or update a medical classification chrono, and that is certain instances the electronic system maintaining the chronos may prompt automated changes to an inmate's medical risk level based on data entered by medical staff.  (Doc. 34-4 at 21-22, ¶ 16.)

On November 28, 2018, during a scheduled visit with Plaintiff, Plaintiff complained his medical classification had been reduced from high risk to medium risk; however, Tate declares a review of the medical classification chronos at that time confirms Plaintiff was classified as a high risk. (*Id*. at 22, ¶ 19.)

//

---

[4] Defendant Tate's declaration is supported by Exhibits A through J. (*See* Doc. 34-4 at 24-47.)

Tate declares that on January 11, 2019, he confirmed to a health program specialist that Plaintiff's medical classification was in fact deemed to be high risk. (*Id*. at 22, ¶ 17.)

Tate further declares that a review of Plaintiff's medical classification chrono dated January 16, 2019, reveals a change from high risk to medium risk. Tate also declares he did not issue the changed chrono. (*Id*. at 22, ¶ 18.) Tate declares the change was prompted automatically by the electronic maintenance system. (*Id*. at 23, ¶ 20.) Tate further declares he did not issue the December 24, 2018 or January 15, 2019 medical chronos. (*Id*.)

### 3. Summary of Defendant Toscano's Declaration

Defendant Toscano declares[5] he is employed as a correctional counselor, provided an explanation of his duties and functions and access to prison records, as well as the medical classification risk levels employed by CDCR and its health care system. (Doc. 34-4 at 49-50, ¶¶ 1-4.)

Toscano declares that as a correctional counselor he does not have the authority to issue a medical classification chrono or to change a medical risk classification. (*Id*. at 50-51, ¶ 5.) A review of an inmate medical classification chrono, Toscano declares, is done in the context of preparing notes and documentation for a classification committee hearing and confirming same. (*Id*.) Toscano further declares that classification committee members neither issue nor decide an inmate's medical classification chrono, though they may review and consider the chronos during committee hearings as part of the overall assessment. (*Id*. at 51, ¶ 7.)

Concerning Plaintiff in particular, Toscano declares he has reviewed the factual allegations asserted by Plaintiff and denies retaliating against Plaintiff for any reason. (*Id*. at 51, ¶ 8.) Toscano states: "To my knowledge, I did not communicate with Dr. Tate concerning any of Mr. Snowden's medical classification chronos referenced in the complaint." (*Id*. at 51, ¶ 9.)

Contrary to Plaintiff's allegations that he appeared before a classification committee on December 24, 2018 or January 16, 2019, Toscano declares records indicate Plaintiff initially appeared before a classification committee on November 27, 2018, and then additionally on January 15, 2019, January 29, 2019 and on June 4, 2019. (*Id*. at 51-52, ¶ 10.)

---

[5] Defendant Toscano's declaration is supported by Exhibits A through G. (See Doc. 34-4 at 55-78.)

Serving as a recorder at both January 2019 hearing, and at the June 4, 2019, hearing, Toscano took notes and documented the proceedings to review Plaintiff's housing and programming needs. (*Id*. at 52, ¶ 11.) Toscano did not "unilaterally decide" Plaintiff's programming or housing placement; rather, the committee as a whole rendered a decision. Toscano denies influencing any committee member and declares the committee did not make any decisions concerning Plaintiff's medical classification level. (*Id*.) Toscano was not involved in Plaintiff's initial classification committee hearing. (*Id*. at 52, ¶ 12.)

Toscano declares, based upon his review of Plaintiff's records, that in preparation for the January 15, 2019, classification committee hearing, Toscano was informed by "medical staff (not Dr. Tate)" that Plaintiff's high risk medical status was "deemed a preference" and that Plaintiff's "medical chrono was updated by a medical provider named Luong Nguyen on January 15, 2019." (*Id*. at 52, ¶ 13.)[6]

Toscano further declares the change in Plaintiff's medical classification from high risk to medium risk "was automated, prompted by a system-based need to synchronize updated clinical information." (*Id*. at 53, ¶ 14.) Toscano did not cause Plaintiff's medical risk level to change at any time. (*Id*.)

Toscano declares a review of Plaintiff's records reveal that Plaintiff's medical classification level was medium risk at the time of his January 29, 2019 classification committee hearing, and had been deemed medium risk as of January 16, 2019, and continued through to June 4, 2019. (*Id*. at 53, ¶¶ 15-16.)

### 4. Analysis

Defendants' evidence reveals neither Defendant Tate nor Defendant Toscano were involved in the change to Plaintiff's medical classification from high risk to medium risk. In fact, the evidence submitted by Defendants reveals the change was prompted by the automated system maintaining inmate medical records and by an entry authored by medical provider Luong Nguyen. Therefore, Defendants have met their initial responsibility of identifying those portions of the record that show there is no genuine issue of material fact that Defendants Tate and

---

[6] At his deposition taken December 18, 2020, Plaintiff testified "Dr. Nguyen" was his physician "right now." (Snowden Depo., at 30.)

1   Toscano retaliated against Plaintiff by changing his medical classification from high risk to

2   medium risk. *Celotex Corp.*, 477 U.S. at 322. The burden now shifts to Plaintiff to establish that a

3   genuine issue as to any material fact actually exists. *Matsushita Elec. Indus. Co.,* 475 U.S. at 586.

4       Plaintiff has failed to meet his burden. Other than disputing Defendants' proffered fact

5   number 45—that Toscano did not communicate with Dr. Tate concerning Plaintiff's medical risk

6   classification—the undisputed evidence reveals that Defendants Tate and Toscano were not

7   involved in the change to Plaintiff's medical classification status. Plaintiff offers nothing more

8   than speculation and conclusory statements to the contrary;[7] however, that is insufficient. *See*

9   *Wood,* 753 F.3d at 905; S*oremekun*, 509 F.3d at 984; *Hansen v. United States*, 7 F.3d at 138.

10       To be clear, the undersigned considered Plaintiff's challenge to Defendants' undisputed

11   fact number 45—that Toscano told Plaintiff, in a "'face to face'" conversation, prior to a

12   classification hearing that Toscano and Dr. Tate had spoken, and that Tate advised Toscano

13   Plaintiff was "no longer high risk medical." (Doc. 37 at 9.) However, even assuming the

14   conversation occurred as Plaintiff alleges,[8] it does not change the outcome here. All other

15   undisputed evidence clearly indicates that neither Tate nor Toscano had anything to do with the

16   change to Plaintiff's medical risk classification. And that Toscano had no authority to do so.  In

17   other words, even if it is assumed that Toscano said he would change Plaintiff's medical

18   classification, Plaintiff does not dispute the fact that Toscano has no authority to issue or change a

19   medical classification. Moreover, even assuming Tate advised Toscano that Plaintiff was "no

20   longer high risk medical," nothing about that statement involves a claim that Toscano or Tate

21   were behind the change. Significantly too, Plaintiff has not disputed Defendants' evidence that

22   indicates the change was prompted by the automated system maintaining inmate medical records

23   and by an entry authored by medical provider Luong Nguyen.

24   //

---

25   [7] *See* Snowden Depo., at 49 (Plaintiff knows Tate retaliated against him because "months later" his high risk medical
26   classification was taken away; asked how Plaintiff knew he'd been retaliated against, Plaintiff testified "It's obvious.
    It's obvious"), 58 (asked what Toscano's motivation was to take Plaintiff's high risk medical classification away,
27   Plaintiff testified it was "to help out a fellow colleague"); *but see* Snowden Depo., at 20 ("I don't know how they did
    it or whatever …," referring to Plaintiff's claim that Defendants Tate and Toscano retaliated against him by changing
28   his medical classification.

[8] *See also* Snowden Depo., at 29, 49, 50-51.

Plaintiff has not established any element of a retaliation claim against either Defendant Tate or Toscano. He has not shown that Defendants Tate and Toscano took some adverse action against him because of his protected conduct, or that such action chilled Plaintiff's exercise of his First Amendment rights and did not advance a legitimate correctional goal. *Rhodes*, 408 F.3d at 567-68; *Brodheim v. Cry*, 584 F.3d at 1269. "A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp*, 477 U.S. at 323. Accordingly, the Court finds Defendants are entitled to summary judgment.

### C.  Qualified Immunity

In the alternative, Defendants assert a right to qualified immunity. (Doc. 34-2 at 12-14.) The defense of qualified immunity shields government officials from liability. *Taylor v. Barkes*, 575 U.S. 822, 825 (2015). Qualified immunity only becomes relevant if a court determines that a constitutional violation has occurred. Because the Court finds as a matter of fact and law that no constitutional violation occurred, the Court need not determine whether Defendants are entitled to qualified immunity.

### VI.    CONCLUSIONS AND RECOMMENDATIONS

For the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1.  Defendants' motion for summary judgment (Doc. 34) be GRANTED in favor of Defendants Tate and Toscano on all claims asserted by Plaintiff; and

2.  Judgment be entered in favor of Defendants Tate and Toscano.

//
//
//
//
//
//
//
//

22

1         These Findings and Recommendations are submitted to the United States District Judge

2    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the

3    Local Rules of Practice for the United States District Court, Eastern District of California. **Within**

4    **14 days** after being served with these Findings and Recommendations, Plaintiff may file written

5    objections with the Court. Such a document should be captioned "Objections to Magistrate

6    Judge's Findings and Recommendations." Plaintiff is advised that failure to file objections within

7    the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951

8    F.2d 1153 (9th Cir. 1991); *Wilkerson v. Wheeler*, 772 F.3d 834, 834 (9th Cir. 2014).

9

10   IT IS SO ORDERED.

11      Dated:   __October 25, 2022__

12                      UNITED STATES MAGISTRATE JUDGE